COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:   Judges Beales, Athey and Callins
Argued at Arlington, Virginia


EDUARDO UGARTE, II

OPINION BY
v.        Record No. 1096-23-4             JUDGE RANDOLPH A. BEALES
MARCH 11, 2025

CATHERINE CORMACK UGARTE, N/K/A
 CATHERINE ANNE CORMACK


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Manuel A. Capsalis, Judge

Robert M. Worster III (Worster Law PLLC, on briefs), for
appellant.

Michelle M. Kaminsky (ShounBach, on brief), for appellee.


Following an evidentiary hearing, the Circuit Court of Fairfax County entered a final

order of divorce granting Catherine Cormack Ugarte ("wife") a divorce *a vinculo matrimonii*

from Eduardo Ugarte, II ("husband") on the grounds that the parties have been separated for a

period of one year as required by Code § 20-91(A)(9)(a).  On appeal, husband argues that the

circuit court erred in finding that wife had attempted "to rehabilitate and save the marriage,"

erred in determining equitable distribution of the marital property, and erred in determining

wife's award of permanent spousal support.

I.  BACKGROUND

"When reviewing a [circuit] court's decision on appeal, we view the evidence in the light

most favorable to the prevailing party, granting it the benefit of any reasonable inferences."

*Wolfe v. Shulan Jiang*, 83 Va. App. 107, 111 (2025) (quoting *Nielsen v. Nielsen*, 73 Va. App.

370, 377 (2021)).  In this case, wife was the prevailing party before the circuit court.

## A. The Divorcing Parties

Husband and wife were married on April 29, 2000, in Pittsburgh, Pennsylvania. They have three children together, all of whom are now over the age of 18 years old. Husband is an attorney and "has a law degree—a J.D.—and an LL.M." During their marriage, husband was employed at various times by IBM, NASDAQ, and West Corporation. Although he was unemployed "for almost two years," he has been employed by Validity since 2021. Wife has "a Master's in elementary education and a Master's in special education." She "was a full-time homemaker for most of the parties' marriage," but she was employed as a teacher at an elementary school in Texas from 2000 to 2001 and as a special education teacher at an elementary school in Fairfax County, Virginia from 2010 to 2011. Since 2018, wife has been employed by Fairfax County Public Schools, first as an instructional assistant and then as a special education teacher. During their marriage, husband and wife resided together with their children at their marital residence in Springfield, Virginia from the time they purchased the house on June 1, 2012, until September 30, 2018, when wife left the marital residence and moved into her own apartment.

On October 8, 2021, wife, through counsel, filed her complaint for divorce in the Circuit Court of Fairfax County. Wife sought a divorce from husband on the grounds of one year separation from May 1, 2019. She also requested an award of spousal support (both *pendente lite* and permanent spousal support), an award of her attorney fees and costs, and that the circuit court determine equitable distribution of the marital property.[1] In response, husband, who was

---

[1] In addition, on October 24, 2022, wife, through counsel, filed a motion for alternate valuation date, requesting an alternate valuation date of May 1, 2019 (wife's claimed date of permanent separation) with respect to the parties' joint E*TRADE investment account and husband's three Capital One accounts that are jointly titled with each of the parties' children. Wife contended that, without her authorization, husband "used significant amounts of money" from those accounts "for post-separation non-marital purposes, including but not limited to, traveling, aviation lessons, large church donations, his own living expenses, his own medical

acting *pro se*, filed his answer and counterclaim for divorce requesting a divorce on the grounds of desertion by wife. Contrary to wife's position, husband alleged that wife formed the intent to permanently separate from husband "[o]n or before January 2018," that wife "constructively abandoned [h]usband on or before April 11, 2018," and that "[t]he parties have continuously lived separate and apart since September 30, 2018."

B. The Evidentiary Hearing

On November 21, 2022, and November 22, 2022, the circuit court heard evidence and argument on the issues of grounds for divorce, equitable distribution, spousal support, and attorney fees and costs.

1. *Grounds for Divorce*

Wife testified that during the marriage, she "was the primary caretaker of the children" and that she and husband "both agreed that it would be a good idea for me to stay home if we could financially afford it and take care of the kids." She noted, however, that husband "was critical of my—me taking care of them" because "[h]e didn't really think I was strict enough with the kids." She claimed that husband would yell at her, which "made me feel really bad," and that she "felt that I was being emotionally abused and verbally abused over the years and that it was getting increasingly more difficult, especially as our kids got older and problems got bigger and more serious." She explained that she "really struggled with coparenting and being married to" husband because things "always had to be his way," and she felt like "he didn't think I did anything right." When asked to describe the impact of husband's behavior on her, wife stated that she "was experiencing a lot of anxiety," that she "lost like 15 pounds in a short amount of time," and that she "was depressed until after I moved out."

---

expenses, entertainment, food and dining." Wife acknowledged, however, that "some of said money was used for mental health and medical care for the parties' children."

- 3 -

Wife's friend, Elizabeth Pacoe, similarly testified that she observed "a power differential" and "sort of controlling behavior" by husband towards wife and the parties' children. She recalled that husband often used humor "at the expense of Mrs. Ugarte" and that she "observed intimidating, angry and what I interpreted to be sort of coercive glances and body language" by husband towards the parties' children. Pacoe opined that "[i]t sort of felt like they were being policed or patrolled" by husband and that the parties' children were "'intimidated' by him." She also observed "anxiety and discomfort in the home," but that when husband "was at work and out of the house there was a much more light and relaxed atmosphere in the home." Pacoe stated that this negative home environment caused wife to "struggle[] with both mental health—with depression, anxiety—as well as physical health with gastrointestinal problems, weight loss."

Addressing the date of separation, wife testified that she "moved out of the house on September 30, 2018." She claimed that husband "told me I had to leave the house" because he was not "going to leave the house," so she "had to get an apartment." Wife maintained that it was not her intent then that the separation be permanent, stating, "I didn't know what I wanted to do at that time. I just needed a break and needed that space to try to figure out—we had a lot going on between us and with the kids. And so I moved out."[2] Wife stated that she later formed the intent to permanently separate from husband on May 1, 2019. She recounted, "So our anniversary is April 29th. And we talked about it that night. And he asked me what I wanted to do. And I said that I wanted to get a divorce. So at that point I felt like that was—it was

---

[2] Wife noted that after she moved out of the marital residence, the parties' children continued to reside with husband in the marital residence on weekdays and then with her in her apartment on the weekends. She explained that she then renewed her teaching license and returned to work as a special education teacher "because the kids were getting older" and because "I didn't feel like things were stable in the marriage. And if I was going to separate I—I wanted to have my own job."

permanent that I wasn't going to go back." She recalled that "we were going to family therapy—all five of us—at the time" and that in April 2019, she told the therapist in front of her family that she "still had not decided" if she "wanted to get a divorce at that point or not."[3] According to wife, after May 1, 2019, she and husband only socialized together "as a family. We went to church sometimes and out to dinner sometimes, but the five of us usually."

Pacoe likewise testified that wife moved out of the marital residence in September 2018, stating, "It was my understanding at that time that she was going through a lot of emotional and physical distress and that she was feeling the need to get some space and distance from particularly the marital relationship to be able to figure out what she wanted to do." She averred that wife formed the intent to permanently separate from husband on May 1, 2019, noting that "it was at that time that she expressed to me that they had irreconcilable differences and she would not be returning to the marriage."

Wife went on to testify that in an attempt to address their marital problems before the separation, she and husband began attending marriage counseling in 2016 or 2017, which she stated continued through April 2019. Wife detailed that the parties' therapy sessions included both couple's counseling and "working on a behavior plan" for the parties' children. Pacoe similarly testified that husband and wife "continued to go to couple's counseling as well as family therapy sessions" after wife had moved out of the marital residence. In particular, wife described the parties' counseling sessions with Ingrid J. Melenbacker, a licensed marriage counselor, which began in September 2018. Wife explained that the counseling included therapy

---

[3] Wife testified that between September 30, 2018 (when she moved out of the marital residence), and May 1, 2019 (when she formed the intent to permanently separate from husband), "[w]e had a lot of stress as a family." She noted that "[t]he kids had some mental health issues," including multiple suicide attempts by the parties' eldest child, and that "our family was in a very fragile state." She also noted that husband was not "in a stable mental health situation" at that time, which worried her.

sessions, joint and individual homework assignments, and other activities outside of the therapy sessions.[4]  However, husband and wife stopped seeing Melenbacker in December 2018 due to the parties' eldest child being admitted to a mental health facility in Watertown, Massachusetts following a suicide attempt.  Husband went to Massachusetts to be with the parties' eldest child during that time, while wife returned to the marital residence to care for the parties' other two children.  During the children's winter break from school, wife and the parties' other two children also went to Massachusetts to be with husband and the parties' eldest child.  Wife noted that in December 2018 and in January 2019, husband (in person) and wife (virtually) attended weekly family therapy sessions with their eldest child in Massachusetts.

Husband, on the other hand, testified, "I did not have a conversation with Catherine in April or May of 2019 about a divorce.  It just didn't happen."  He maintained that he "found out for the first time that Catherine's intention was to divorce me" on March 11, 2020, when he received an email from wife about a "marital separation."  He acknowledged that wife told him on April 11, 2018, that "she intended to separate," but he stated that he "interpreted that as a warning."  He claimed that wife "abandoned me in 2018," which "left me with essentially the sole responsibility of caring for the children at a time when—in that period I ended up losing my job and was unemployed for almost two years."  In addition, husband claimed that the parties' marriage counseling "ended in November of 2018" and that "there was no more couple['s] therapy after that."  He asserted that even though he and wife "were certainly physically there" during the parties' counseling sessions, wife "was disengaged in therapy."  He averred that

---

[4] Wife acknowledged that she had asked to address the issue of separation during the parties' counseling sessions in 2018, but she stated that it was not because she had already decided that she wanted to permanently separate from husband, but rather because she was still unsure of what she wanted in terms of a separation.

- 6 -

wife's lack of engagement in the counseling "certainly didn't help the relationship and it didn't help try to fix or remedy the situation."

## 2. *Equitable Distribution*

Wife asked the circuit court to divide the parties' marital property "[f]ifty-fifty." Relevant to this appeal, wife testified that she "had to borrow money from my brother," Michael Cormack, to pay her rent and her other expenses after she moved out of the marital residence in September 2018.[5] Noting that she and her brother "wrote promissory notes," wife maintained that the money from her brother "was always intended as a loan"—which she would pay back once the divorce was finalized.[6] She also testified that "between my parents and my brother and

---

[5] Wife testified that her TD Bank account statement showed deposits of $24,900 in October 2018 and again in January 2019, which she characterized as loans from her brother. However, she noted that her TD Bank account statement for November 2018 included a "hundred dollars [that] might have been from my mother," as well as $500 that was "a cash gift from my brother." Wife also received cash deposits from her mother, but she explained that her mother "reimburses me with cash" for doing "all of her grocery shopping, clothes shopping, household items—that kind of stuff." Wife stated that she considered this bank account to be her separate property.

[6] Without objection from husband, wife's counsel introduced into evidence copies of the purported promissory notes between wife and her brother. The first promissory note, dated October 10, 2018 (but signed by wife on October 11, 2018), was in the amount of "twenty-five thousand US Dollars ($25,000.00)." The second promissory note, dated January 30, 2019 (but signed by wife on September 9, 2022), was in the amount of "twenty thousand US Dollars ($25,000.00)" in one place and "twenty-five thousand Dollars ($25,000)" in another place, which wife claimed meant $25,000. The third promissory note, dated September 10, 2019 (but signed by wife on December 11, 2019), was in the amount of "twenty-five thousand US Dollars ($25,000.00)." The fourth promissory note, dated April 16, 2020 (but signed by wife on May 1, 2020), was in the amount of "twenty thousand US Dollars ($20,000.00)." The fifth promissory note, dated March 16, 2021 (but signed by wife on August 17, 2022), was in the amount of "twenty thousand US Dollars ($8,000.00)" in one place and "twenty thousand Dollars ($20,000)" in another place, which wife claimed meant $8,000. Finally, the sixth promissory note, dated March 15, 2022 (but signed by wife on August 17, 2022), was in the amount of "twenty thousand US Dollars ($10,000.00)" in one place and "twenty thousand Dollars ($20,000)" in another place, which wife claimed meant $10,000. Wife maintained that the total amount of the promissory notes was $113,000. She acknowledged, however, that some of the promissory notes were backdated, but she claimed that she "couldn't find the other promissory note, so we made another one." Wife considered this $113,000 to be her separate debt.

his wife they ended up loaning us a hundred thousand dollars to put a down payment on the house" in 2012 to allow husband and wife to make "[a] cash offer" on the marital residence. Wife acknowledged, however, that her brother had given the family monetary gifts during the marriage "[t]hat accumulated to the tens of thousands of dollars" and that her brother had established a pattern of giving the family monetary gifts.[7] She also acknowledged that the parties' children "all have 529 accounts that my parents and my brother have put money in over the years. So their tuition is currently paid through the 529s." She clarified that her brother and her mother had put $90,000 in each child's Virginia 529 college savings account.

Husband, on the other hand, testified that wife's brother "has gifted our family $428,400 since 2003," which "includes the $270,000 in the 529 plans." He maintained that the "promissory notes from 2018 to today" were "gifts and not loans"—and that they were "[e]xclusively for Catherine" to be used for "Catherine's living expenses." He also averred that "the 529 donations clearly were for the benefit of the children" and that "the other gifts that were given to us during the marriage before 2018 were . . . intended to be a benefit for the family."

### 3. *Permanent Spousal Support*

Wife also asked the circuit court to award her permanent spousal support in the amount of $2,900 per month. To support her request, wife's counsel provided the circuit court with a "spousal support worksheet to work off of" in determining the award of permanent spousal support. When the circuit court judge asked husband, "[I]s there anything else in this worksheet that you believe is incorrect?", husband objected to "the use of the worksheet" in general. The circuit court judge responded by saying that "it's important for the Court to work off of a

---

[7] For example, wife noted that her brother and his wife had previously "bought plane tickets for us to go visit them almost every summer" in Vancouver, Canada and that "they've also given us furniture, like their old furniture." She also noted that "just over the years I think my brother's helped us out, like given us nice Christmas gifts. And he paid for the cleaners for a while" at the marital residence.

worksheet" and that "this is the calculation that has to be made." The judge then explained to the parties that "this worksheet as set up applies the—what has to be, for want of a better term, 'plugged in' to determine what, if any, spousal support is owed." In response to husband's objection, wife's counsel attempted to clarify that "we certainly were not requesting the Court to abide by the guidelines," stating, "We put them in there as a starting point."

### 4. *Attorney Fees and Costs*

Finally, wife asked the circuit court to award her attorney fees and costs. In support of this request, wife's counsel filed an affidavit affirming that wife incurred legal fees and expenses in the amount of $47,560.37. In his counterclaim for divorce, husband also asked the circuit court to award him attorney fees and costs, even though he was then acting *pro se*.

### C. The Circuit Court's Findings

By order and letter opinion dated March 2, 2023, the circuit court granted wife's complaint for divorce, denied husband's counterclaim for divorce, determined equitable distribution of the marital property, awarded wife spousal support, and awarded wife attorney fees and costs.

### 1. *Grounds for Divorce*

The circuit court found that "the wife met her burden of proof regarding her claim for divorce based on one year of separation, and that she formed the intent to permanently separate from the husband on May 1, 2019"—which "was established by the testimony of both the wife and that of Elizabeth Pacoe, and consistent with other evidence established at trial." The circuit court concluded that the "evidence established that the marriage deteriorated and reached the point that the wife was justified in the actions she ultimately took in permanently separating."

Conversely, the circuit court found that "the husband did not meet his burden of proof regarding his counterclaim for divorce based on the wife's alleged willful desertion"—as the

evidence showed that "the husband was over an extended period of time controlling, belittling, and verbally abusive toward the wife," which "had a sufficiently detrimental effect such that the wife suffered both emotionally and physically." In making that finding, the circuit court noted that wife experienced "anxiety and depression" and "required counseling and medication" as a result of "husband's actions and demeanor toward the wife." In addition, relevant to this appeal, the circuit court specifically found that "wife participated in an extended course of marriage counseling in an attempt to rehabilitate and save the marriage." The circuit court emphasized that "[t]here were extended efforts at marital counseling," that "wife returned to the marital home," and that, "[p]erhaps most significantly, over a period of years the wife was the recipient of the husband's abusive behavior." The circuit court then concluded that, "[w]hile the evidence showed a marriage that was teetering, it did not establish willful desertion, and May 1, 2019 was the date of permanent separation."

## 2. *Equitable Distribution*

Considering the statutory factors set forth in Code § 20-107.3(E), the circuit court found, relevant to this appeal, that "loans from the wife's brother, to which the wife remains indebted, were utilized in satisfying marital expenses, the purchase of the family residence, and for the children's respective 529 accounts."[8] Under a bolded subsection titled, "Fixed debt loans from Michael Cormack," the circuit court concluded:

---

[8] In Exhibit A (titled "Real and Personal Property") of wife's post-trial brief to the circuit court, wife characterized the $113,000 from her brother as her separate fixed debt. In determining equitable distribution, the circuit court noted that it "adopts and incorporates herein as if fully set forth Exhibit A of wife's post-trial brief" and that Exhibit A "shall be incorporated in and made an attachment to the Order that will be submitted by the parties in this matter." In Exhibit B (titled "Proposed Distribution of Property") of wife's post-trial brief to the circuit court, wife likewise characterized the $113,000 in "[l]oans from M. Corm." as her separate debt. The circuit court also noted that it "adopts and incorporates herein wife's Exhibit B" and that Exhibit B "shall be incorporated in and made an attachment to the Order that will be submitted by the parties in this matter."

> The better weight of the evidence established and the Court finds
> that a series of loans totaling $113,000 to the wife from her
> brother, Michael Cormack, to assist with her and the family's
> expenses during the marriage and affirmed through promissory
> notes, are her separate fixed debt. Contrary to husband's
> argument, there was insufficient evidence for the Court to find that
> these loans were forgiven, or considered to be gifts, or otherwise
> not a continuing liability of the wife.

The circuit court ordered husband to pay wife a monetary award of $270,549.50.[9]

### 3. *Permanent Spousal Support*

The circuit court determined that wife's monthly income is "$5,825.41," that wife's monthly expenses are "$3,315," that husband's monthly income is "$21,746," and that husband "produced no testimony or evidence regarding his monthly expenses and therefore none are before the Court." In making these determinations, the circuit court "considered and applied all statutory factors and considerations as set forth in" Code § 20-107.1, as well as "the circumstances and factors which contributed to the dissolution of the marriage." Relevant to this appeal, the circuit court found that wife "is indebted to her brother in the amount of $113,000 for a series of loans from him during the marriage to assist with her and the family's expenses"— and that "there was insufficient evidence for the Court to find that these loans were forgiven, or considered to be gifts, or otherwise not a continuing liability of the wife." In addition, under a bolded subsection titled, "Guidelines calculation," the circuit court specifically found

> the wife's monthly gross income to be $5,825.00 and the
> husband's monthly gross income to be $21,746.00. The Court
> finds no applicable adjustments to either party's gross income.

---

[9] In so ruling, the circuit court also granted wife's motion for alternate valuation date for the parties' joint E*TRADE investment account and husband's jointly titled Capital One accounts with each of the parties' three children, finding that "a monetary award will be granted to the wife for 50% of the value of each of these accounts as of May 1, 2019." The circuit court found that "husband withdrew $107,112.79 from the parties' joint E*TRADE investment account after May 1, 2019, the date of permanent separation, through the account's complete depletion on May 4, 2021." The circuit court further found that "husband withdrew from each of the three aforementioned Capital One accounts the sum of $21,500.00 after May 1, 2019, through September 30, 2022, resulting in an aggregate depletion of $64,500.00."

- 11 -

Guidelines support calculations determine the proposed spousal support payable by the husband to the wife to be in the monthly amount of $2,959.00. The Court finds this amount to be fair, equitable, and supported by the evidence before the Court. The Court does not find any adjustment appropriate or supported by the evidence. The Court therefore [o]rders that the monthly spousal support to the wife shall be $2,959.00.

The spousal support worksheet, which was attached as Exhibit C to wife's post-trial brief to the circuit court, likewise indicated that wife's monthly gross income is $5,825, that husband's monthly gross income is $21,747, and that the guideline spousal support amount payable to wife is $2,959.

### 4. *Attorney Fees and Costs*

Finally, the circuit court found that "equity and justice require that the wife be awarded half of her attorney's fees and costs" in the amount of $23,780—as "the evidence indicated a significant inequitable financial position of the parties in litigating the case." In so ruling, the circuit court pointed out that "the wife, who is not an attorney, was represented by counsel, whereas the husband, who is an attorney, represented himself." The circuit court noted that husband, "[a]s an attorney, albeit not one who regularly practices family law," nevertheless "should be aware of court rules, court procedure, and the rules of evidence." The circuit court determined that "husband argued facts, both in the hearing and in his post-hearing brief, not before the Court or that had been ruled upon as inadmissible by the Court," which "resulted in the wife filing an [o]bjection to husband's post-trial brief, pointing out several instances in which the husband improperly argued such facts." The circuit court also determined that "the wife was forced to file motions that should have been unnecessary, including a [m]otion to [c]ompel and a [m]otion *in* [*l*]*imine*, as well as the husband failing or refusing to agree to any trial stipulations proposed by the wife."

- 12 -

## D. The Final Order of Divorce

By final order of divorce entered on May 25, 2023, the circuit court granted wife "a divorce, a *vinculo matrimonii*, from the [h]usband on the ground that the parties have lived separate and apart, without any cohabitation and without interruption, for more than one year, to wit: since May 1, 2019, pursuant to § 20-91(A)(9)(a) of the Code of Virginia, 1950, as amended." As part of its equitable distribution determination, the circuit court ordered husband to pay wife "a monetary award of $270,549.50" for "equalization of the marital assets."[10] The circuit court also ordered husband to pay wife "$2,959 per month in spousal support, indefinitely." Finally, the circuit court ordered husband to pay wife "the amount of $23,780 for her attorneys' fees incurred in this matter." The circuit court also attached and incorporated its March 2, 2023 letter opinion to the final order of divorce. Husband now appeals to this Court.

## II. ANALYSIS

## A. Grounds for Divorce

On appeal, husband argues that the circuit court "erred in finding that [w]ife attempted to rehabilitate and save the marriage, as this finding was not supported by the evidence." He contends that wife "did not engage in an extended period of marriage counseling in an attempt to save the parties' marriage."

It is well settled that a circuit court's determination of matters that lie within its discretion is reversible on appeal only for an abuse of that discretion. *Payne v. Payne*, 77 Va. App. 570, 584 (2023). Furthermore, a circuit court's finding of fact "will not be set aside unless plainly wrong or without evidence to support it." *Id.* (quoting *Hughes v. Hughes*, 33 Va. App. 141, 146

---

[10] The final order of divorce also contained a subsection titled, "Loans from Michael Cormack," in which the circuit court reiterated its findings that "the series of loans totaling $113,000 from Michael Cormack to [w]ife are [w]ife's separate debt. Wife shall be solely responsible, as between the parties, for paying of such debt."

(2000)); Code § 8.01-680. "Under this standard, if 'the record contains credible evidence in support of the findings made by that court, we may not retry the facts or substitute our view of the facts for those of the [circuit] court.'" *Congdon v. Congdon*, 40 Va. App. 255, 266 (2003) (quoting *Calvin v. Calvin*, 31 Va. App. 181, 183 (1999)). "However, this Court reviews *de novo* all issues of law, including those involving 'examination of the proper interpretation and application of'" Code § 20-91(A)(9)(a). *Payne*, 77 Va. App. at 584 (quoting *Dixon v. Dixon*, 71 Va. App. 709, 718 (2020)).

In this case, wife testified that she "moved out of the house on September 30, 2018," and that it was not her intent then that the separation be permanent. She explained that she "didn't know what [she] wanted to do at that time" and that she "just needed a break and needed that space to try to figure out" what she wanted to do with the marriage. Wife's friend, Elizabeth Pacoe, likewise testified that wife moved out of the marital residence in September 2018 because "she was going through a lot of emotional and physical distress and that she was feeling the need to get some space and distance from particularly the marital relationship to be able to figure out what she wanted to do." Furthermore, wife testified that she did not form the intent to separate permanently from husband until May 1, 2019. Pacoe's testimony also supported wife's claimed date of separation, as "it was at that time that she expressed to me that they had irreconcilable differences and she would not be returning to the marriage."

In addition, wife testified that she and husband began attending marriage counseling in 2016 or 2017 and that the counseling continued through April 2019. Pacoe likewise testified that husband and wife "continued to go to couple's counseling as well as family therapy sessions" even after wife had moved out of the marital residence in September 2018. Wife went on to explain that the therapy sessions involved both couple's counseling and "working on a behavior plan" for the parties' children. In particular, she described the parties' counseling sessions with

Ingrid J. Melenbacker, a licensed marriage counselor, from September 2018 to December 2018—when the parties' eldest child was admitted to a mental health facility in Watertown, Massachusetts following a suicide attempt. Husband acknowledged that he and wife participated in counseling sessions, but he asserted that wife "was disengaged in therapy."

After hearing the evidence and argument, the circuit court concluded that the "evidence established that the marriage deteriorated and reached the point that the wife was justified in the actions she ultimately took in permanently separating" on May 1, 2019. In so ruling, the circuit court specifically found that "wife participated in an extended course of marriage counseling in an attempt to rehabilitate and save the marriage" and that "[t]here were extended efforts at marital counseling." Indeed, wife testified that she and husband went to couple's counseling during the marriage, even after she left the marital residence in September 2018. Pacoe's testimony corroborated wife's testimony. Because the record before this Court on appeal contains credible evidence to support the circuit court's finding of fact regarding wife's participation in marriage counseling and because this finding of fact is not plainly wrong, we will not disturb the circuit court's ruling on the grounds for divorce.

## B. Equitable Distribution

Husband next argues that the circuit court "erred in finding that funds given to [w]ife by her brother were loans, and not gifts, as this was not supported by the evidence." He contends that the circuit court "erred in finding that proceeds from the [w]ife's brother's promissory notes were used for marital expenses, purchase of the family residence, children's 529 plans and to assist with her and the family's expenses during the marriage, as this was not supported by the evidence." He also contends that the circuit court's mischaracterization of certain gifts as loans "necessarily impacted the analysis for spousal support as well as equitable distribution."

"On review, a circuit court's 'equitable distribution award will not be overturned unless the [appellate court] finds an abuse of discretion, misapplication or wrongful application of the equitable distribution statute, or lack of evidence to support the award.'" *Dixon*, 71 Va. App. at 717-18 (quoting *Anthony v. Skolnick-Lozano*, 63 Va. App. 76, 83 (2014)). "However, to the extent that the appeal requires an examination of the proper interpretation and application of Code § 20-107.3, it involves issues of law, which the Court reviews *de novo* on appeal." *Id.* at 718. "In reviewing an equitable distribution award on appeal, we have recognized that the [circuit] court's job is a difficult one, and we rely heavily on the discretion of the [circuit court] judge in weighing the many considerations and circumstances that are presented in each case." *Stark v. Dinarany*, 73 Va. App. 733, 749-50 (2021) (quoting *Wright v. Wright*, 61 Va. App. 432, 449-50 (2013)).

"In making an equitable distribution of property under [Code § 20-107.3(A)], the [circuit] court first must classify the property as separate, marital, or part separate and part marital." *Lightburn v. Lightburn*, 22 Va. App. 612, 616 (1996). Pursuant to the statute, separate property includes "all property, real and personal, acquired by either party before the marriage," as well as "all property acquired during the marriage by bequest, devise, descent, survivorship or *gift* from a source other than the other party" and "all property acquired during the marriage in exchange for or from the proceeds of sale of separate property." Code § 20-107.3(A)(1) (emphasis added). Marital property, on the other hand, includes "all property titled in the names of both parties" and "all other property acquired by each party during the marriage which is not separate property." Code § 20-107.3(A)(2).

It is well established that "[a]ll property acquired during marriage is presumed to be marital property," and "[t]he party claiming that property acquired during the marriage is separate property bears the burden of rebutting this presumption." *Courembis v. Courembis*, 43

Va. App. 18, 34 (2004). "Thus, where evidence is presented that property was acquired during the marriage, the [circuit court] judge must conclude that it is marital property unless adequate evidence is produced to establish that it is separate property as defined in Code § 20-107.3(A)(1)." *Id.* at 35 (quoting *Lambert v. Lambert*, 6 Va. App. 94, 99 (1988)). Although "gifts from others to a party represent separate property" under the statute, *Sfreddo v. Sfreddo*, 59 Va. App. 471, 480 (2012), the party "claiming property as separate has the burden to produce satisfactory evidence to rebut this presumption," *Rexrode v. Rexrode*, 1 Va. App. 385, 392 (1986). This Court has explained that, in instances of "a gift to [a party], if there is credible evidence presented to show that the property was intended by the donor to be the separate property of [that party], the presumption is overcome, and the burden shifts to the party seeking to have the property classified as marital." *Stainback v. Stainback*, 11 Va. App. 13, 17 (1990).

"We review issues of contract interpretation de novo." *City of Chesapeake v. Dominion Securityplus Self Storage, L.L.C.*, 291 Va. 327, 334 (2016) (quoting *Bailey v. Loudoun Cnty. Sheriff's Office*, 288 Va. 159, 169 (2014)). Likewise, whether a transaction "constituted a gift is a question of law," and "we review the circuit court's resolution on that issue de novo." *Smith v. Mountjoy*, 280 Va. 46, 53 (2010). "To establish the existence of a gift, the donee must prove by clear and convincing evidence: '(1) the intention on the part of the donor to make the gift; (2) delivery or transfer of the gift; and (3) acceptance of the gift by the donee.'" *Utsch v. Utsch*, 38 Va. App. 450, 458 (2002) (quoting *Theismann v. Theismann*, 22 Va. App. 557, 566, *aff'd on reh'g en banc*, 23 Va. App. 697 (1996)). Indeed, "the law does not presume a gift and where a donee claims title to personal property by virtue of a gift *inter vivos*, the burden of proof rests upon him to show every fact and circumstance necessary to constitute a valid gift by clear and convincing evidence." *Rust v. Phillips*, 208 Va. 573, 578 (1968). Thus, "[a] clear and unmistakable intention on the part of the donor to make a gift of his property is an essential

requisite to a gift *inter vivos*.  And this intention must be inconsistent with any other theory." *Monds v. Monds*, 68 Va. App. 674, 689 (2018) (quoting *Matthews v. Hanson*, 145 Va. 614, 619 (1926)).

Wife concedes on brief and at oral argument before this Court that the circuit court "mischaracterized gifts provided to the parties during the marriage as loans," but she contends that "such mischaracterization was harmless."  She acknowledges:

> Both parties testified that [w]ife's brother gave money to the parties during the marriage in the form of opening and contributing to Virginia 529 accounts for all three of the parties' children; purchasing plane tickets for visits to Vancouver; providing a cleaning service; providing a limited amount of money during a time when [h]usband was laid off from employment, and depositing money into the parties' joint account to assist with a home purchase.

In addition, wife concedes that the circuit court was incorrect when it found that the loans were used to "assist with [wife's] and the family's expenses during the marriage," as "[w]ife testified that she used the funds for living expenses, including for expenses for the children, during the period not only after the date of separation, but also for approximately eight months prior to separation, when she moved into a separate residence."

In determining equitable distribution, the circuit court expressly found that "loans from the wife's brother, to which the wife remains indebted, were utilized in satisfying marital expenses, the purchase of the family residence, and for the children's respective 529 accounts." The circuit court further found that "a series of loans totaling $113,000 to the wife from her brother, Michael Cormack, to assist with her and the family's expenses during the marriage and affirmed through promissory notes, are her separate fixed debt."

However, the record before this Court on appeal supports both wife's concession and husband's contention that the circuit court made erroneous findings of fact concerning the money transferred by wife's brother—and that these erroneous findings of fact impacted the circuit

court's equitable distribution determination. Indeed, wife testified that her brother had given the family monetary *gifts* during the marriage "[t]hat accumulated to the tens of thousands of dollars" and that her brother had established a pattern of giving the family monetary *gifts*. She noted that her brother had "bought plane tickets for us to go visit them almost every summer," that "they've also given us furniture, like their old furniture," and that "just over the years I think my brother's helped us out, like given us nice Christmas gifts" and "paid for the cleaners for a while." Wife also noted that her brother and her mother had put $90,000 in each of the children's Virginia 529 college savings accounts. Husband likewise asserted that these "gifts that were given to us during the marriage before 2018 were . . . intended to be a benefit for the family."

Furthermore, the circuit court erred in determining that the purported promissory notes amounted to $113,000—as two of those "promissory notes" contain clear discrepancies between the written amounts and the numerical amounts. It is a fundamental principle in contract interpretation that if a negotiable instrument contains contradictory terms, "words prevail over numbers." U.C.C. § 3-114. In this case, although the numerical amounts on the promissory notes total between $113,000 and $135,000, the written amounts on the promissory notes actually total between $130,000 and $135,000. Thus, by their plain and unambiguous language, the purported promissory notes amount to between $130,000 and $135,000, and the circuit court erred in finding otherwise.

In short, because the circuit court erred in evaluating whether the funds from wife's brother were loans or gifts, we reverse the circuit court's equitable distribution determination. We also therefore must remand this matter for the circuit court to reevaluate the gifts and loans

- 19 -

from wife's brother to recalculate the monetary contributions made to the marriage—and then to reassess and redetermine equitable distribution.[11]

## C. Permanent Spousal Support

Finally, husband argues that the circuit court "abused its discretion by making an error of law—relying upon spousal support guidelines for a non *pendente lite* award of spousal support." He contends that the circuit court erroneously "applied the 'presumptive formula' of the *pendente lite* spousal support statute"—instead of applying the "non-*pendente lite* spousal support statute," which "contains neither a formula nor any presumption of correctness, only factors to be considered."

"Whether and how much spousal support will be awarded is a matter of discretion for the [circuit] court." *Giraldi v. Giraldi*, 64 Va. App. 676, 681 (2015) (quoting *Northcutt v. Northcutt*, 39 Va. App. 192, 196 (2002)). Indeed, the circuit court has "broad discretion in setting spousal support and its determination will not be disturbed except for a clear abuse of discretion." *Id.* at 681-82 (quoting *Fadness v. Fadness*, 52 Va. App. 833, 845 (2008)). The circuit court's decision regarding spousal support will be reversed on appeal only if "its decision is plainly wrong or without evidence to support it." *Id.* at 682 (quoting *Fadness*, 52 Va. App. at 845). Furthermore, the circuit court "by definition abuses its discretion when it makes an error of law," and "[t]he abuse-of-discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions.'" *Id.* (quoting *Porter v. Commonwealth*, 276 Va. 203, 260 (2008)).

---

[11] "[W]here an equitable distribution award is reversed on appeal and 'the provisions with regard to the marital property are to be considered on remand, the [circuit] court must necessarily re-examine spousal support in the light of whatever new or different considerations flow from the additional proceedings.'" *Robinson v. Robinson*, 46 Va. App. 652, 671 (2005) (quoting *McGinnis v. McGinnis*, 1 Va. App. 272, 277 (1985)). Because we reverse the circuit court's equitable distribution determination and remand for reconsideration (and for the other reasons stated *infra*), we further direct the circuit court, on remand, to reconsider the award of permanent spousal support.

The Supreme Court has stated that a circuit court "grants pendente lite relief pursuant to Code § 20-103, while a request for permanent spousal support or a reservation of permanent spousal support is made pursuant to Code § 20-107.1. The two statutory schemes are separate and distinct." *Harrell v. Harrell*, 272 Va. 652, 657 (2006). "Code § 20-107.1 authorizes a court to order [permanent] spousal support after considering numerous requisite factors," and "[a] review of all the factors contained in Code § 20-107.1 is mandatory." *Chaney v. Karabaic-Chaney*, 71 Va. App. 431, 435 (2020) (quoting *Ray v. Ray*, 4 Va. App. 509, 513 (1987)). In determining whether to award permanent spousal support, the circuit court must consider "the circumstances and factors which contributed to the dissolution of the marriage," as well as the statutory factors enumerated in Code § 20-107.1(E). In addition, for contested divorces, the circuit court's order granting, reserving, or denying a request for permanent spousal support must "be accompanied by written findings and conclusions of the court identifying the factors in subsection E which support the court's order." Code § 20-107.1(F).

This Court has recognized that "an award of Code § 20-107.1 spousal support made pursuant to Code § 20-103 criteria would be erroneous as would an award of Code § 20-103 *pendente lite* support based upon the criteria of Code § 20-107.1." *Weizenbaum v. Weizenbaum*, 12 Va. App. 899, 904 (1991). It follows that the guidelines for *pendente lite* spousal support

> cannot serve as a substitute for the consideration of the Code § 20-107.1(E) factors or the requirement imposed by Code § 20-107.1(F) that [circuit] courts provide "written findings and conclusions identifying the factors in subsection E which support the court's order." Nor, under the discretionary scheme set forth in Code § 20-107.1, could such guidelines form a presumptive baseline.

*Coleman v. Coleman*, No. 0633-11-2, slip op. at 5 n.3, 2011 Va. App. LEXIS 356, at *8 n.3 (Nov. 22, 2011).[12] Thus, a circuit court's adopting a permanent spousal support figure derived from the guidelines worksheet for *pendente lite* spousal support would constitute an error of law. *Id.*at 5, 2011 Va. App. LEXIS 356, at *8; *see also Shooltz v. Shooltz*, 27 Va. App. 264, 271 (1998) (stating that a circuit court "by definition abuses its discretion when it makes an error of law").

In this case, the circuit court clearly relied on the guidelines worksheet for *pendente lite* spousal support in determining wife's award of permanent spousal support. At the evidentiary hearing, wife's counsel provided the circuit court with a "spousal support worksheet to work off of" in determining the award of permanent spousal support. The circuit court judge then told the parties that "it's important for the Court to work off of a worksheet" and that "this is the calculation that has to be made." The judge explained to the parties that "this worksheet as set up applies the—what has to be, for want of a better term, 'plugged in' to determine what, if any, spousal support is owed."

Furthermore, in its letter opinion under a bolded subsection titled, "Guidelines calculation," the circuit court found "wife's monthly gross income to be $5,825.00 and the husband's monthly gross income to be $21,746.00." The circuit court then noted, "Guidelines support calculations determine the proposed spousal support payable by the husband to the wife to be in the monthly amount of $2,959.00." The circuit court, in turn, awarded wife $2,959 in permanent monthly spousal support, which even exceeded the $2,900 per month that wife had originally requested in her complaint for divorce. The record before this Court on appeal shows that the circuit court's spousal support figures were, in fact, identical to those contained in the

---

[12] While not binding, unpublished decisions may be cited as persuasive authority. *See* Rule 5A:1(f); *Smith v. Commonwealth*, 78 Va. App. 371, 383 n.4 (2023).

spousal support worksheet. In short, the circuit court erred by relying on the *pendente lite* spousal support guidelines in determining wife's award of *permanent* spousal support.

For all of these reasons, we reverse the circuit court's award of permanent spousal support and remand for the circuit court first to reassess and recalculate equitable distribution— and then to recalculate the award of permanent spousal support.[13] *See Duva v. Duva*, 55 Va. App. 286, 301 (2009) ("Because the [circuit] court cannot decide the issues pertaining to permanent spousal support until the equitable distribution issue is resolved, we reverse and remand the [circuit] court's award of spousal support.").

### D. Appellate Attorney Fees

Both parties seek an award of their respective attorney fees on appeal. "We award appellate fees only in the unusual case where the arguments on appeal are 'not fairly debatable under any reasonable construction of the record or the governing legal principles. We have no reluctance imposing fees in such circumstances.'" *Cabral v. Cabral*, 62 Va. App. 600, 613 n.10 (2013) (quoting *Brandau v. Brandau*, 52 Va. App. 632, 642 (2008)). Applying this standard and given that both parties have partially prevailed on appeal, we deny both parties' requests for appellate attorney fees. *See Sfreddo*, 59 Va. App. at 495.

### III. CONCLUSION

In short, we affirm the circuit court's grant of divorce under the grounds of living separate and apart for one year. We hold that the circuit court's finding of fact that wife "participated in an extended course of marriage counseling in an attempt to rehabilitate and save

---

[13] While this appeal was pending in this Court, husband, by counsel, moved this Court "for leave to file a petition in the [circuit] court for relief pursuant to Code § 20-109A to decrease or terminate his spousal support obligation due to a material change of circumstances." Given our holding in this appeal to reverse the circuit court's award of permanent spousal support and to remand for the circuit court to recalculate that spousal support, we find that husband's motion is moot.

the marriage" was supported by credible evidence in the record and was not plainly wrong. However, we reverse the circuit court's equitable distribution determination because the circuit court based its determination on a plainly wrong finding of fact, and wife acknowledges that the circuit court made an erroneous finding of fact. The circuit court incorrectly found that all the money provided by wife's brother throughout the marriage (and after the separation) were loans and not gifts, and that error resulted in the circuit court incorrectly determining equitable distribution. In addition, we reverse the circuit court's award of permanent spousal support (1) because the circuit court erroneously relied on the *pendente lite* spousal support guidelines, which cannot be done when calculating the award of *permanent* spousal support, and (2) because spousal support must be recalculated after equitable distribution has been reassessed and redone. Therefore, we remand this matter to the circuit court for it to reassess and redetermine equitable distribution and then for it also to recalculate spousal support.

*Affirmed in part, and reversed and remanded in part.*